JOHN J. SHAEFFER (SBN 138331)
   JShaeffer@FoxRothschild.com
BENJAMIN H. McCoy (*pro hac vice forthcoming*)
   Bmccoy@FoxRothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone: 310.598.4150
Facsimile: 310.556.9828

Attorneys for Plaintiff,
BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, A DIVISION OF
HEALTH CARE SERVICE CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, a division of HEALTH CARE SERVICE CORPORATION, a Mutual Legal Reserve Company,<br><br>Plaintiff,<br><br>v.<br><br>SOUTH COAST BEHAVIORAL HEALTH LLC; EXCELLENCE RECOVERY, LLC; EVERYTHING IN EXCELLENCE RECOVERY LLC; CARI PASSMORE; RAD LIFE RECOVERY, LLC; BRETT PERSHALL; RANDALL EISWORTH;<br><br>Defendants. | Case No.: 2:24-cv-10683<br><br>**FIRST AMENDED COMPLAINT**<br>**(1) Fraud**<br>**(2) RICO, 18 U.S.C. § 1962(c)**<br>**(3) RICO Conspiracy, 18 U.S.C. § 1962(d)**<br>**(4) Negligent Misrepresentation**<br>**(5) Intentional Interference with Economic/Contractual Relationships**<br>**(6) Aiding and Abetting Tortious Conduct**<br>**(7) Violations of Business and Professional Code § 17200**<br>**(8) Money Had and Received**<br>**(9) Unjust Enrichment, Quantum Meruit, Restitution** |

Plaintiff Blue Cross and Blue Shield of Oklahoma, an unincorporated division of Health Care Service Corporation, a Mutual Legal Reserve Company ("BCBSOK"), by way of this Complaint against Defendants South Coast Behavioral Health LLC ("SCBH"), Excellence Recovery LLC ("Excellence Recovery"),

-1-

Everything in Excellence Recovery LLC ("EIE"), Rad Life Recovery, LLC, ("Rad Life"), Cari Passmore ("Passmore"), Brett Pershall ("Pershall"), and Randall Eisworth ("Eisworth," and collectively with others, "Defendants"), alleges as follows:

## INTRODUCTION

1.    Since at least 2020, BCBSOK and hundreds of individuals suffering from Substance Use Disorder ("SUD") have been victimized by California-based SUD treatment providers and their co-conspirators.

2.    California and Oklahoma are separated by over 1,000 miles and multiple states. There are hundreds, if not thousands, of SUD treatment providers between them. And yet, in the last few years alone, thousands of alleged Oklahoma residents have been trafficked across the country to California under the guise of obtaining SUD treatment. The one thing they have in common is that they are members of BCBSOK health benefit plans, most of them having been enrolled right before their arrival in California.

3.    This surprising migration is not a result of quality treatment. Rather, it is driven by an army of fraudsters that have overrun certain parts of California's SUD treatment industry to prey upon alleged Oklahoma residents, many of whom are members of Native American tribes.

4.    These SUD providers employ a range of fraudulent tactics. They hire "body brokers" to hunt down potential patients in exchange for kickbacks. Body brokers work with insurance agents to fraudulently enroll individuals in insurance plans. Once enrolled, patients are shipped across the country to receive "treatment," the main goal of which is to enrich the providers, body brokers, insurance agents, and the others involved in the schemes. There are unlawful kickbacks at every level. In fact, many patients themselves receive cash, free "treatment," and housing, which unlawfully influences their choice of providers and induces them to stay under the control of a particular provider so that their insurance can continue to be billed. It is

becoming exceedingly difficult for good, quality, providers to operate in an industry awash in kickbacks and *de facto* bribes.

5. When insurance payments run out, the SUD providers kick patients to the curb, leaving these vulnerable individuals to fend for themselves thousands of miles from their homes. Often, these individuals are given no notice of their impending evictions and suddenly find themselves on the streets with no money to afford housing or the necessities of daily life, much less an expensive trip back home. Putting these already-vulnerable individuals in such desperate circumstances only heightens the chances for relapse.

6. As explained below, the defendants here are among the worst perpetrators of these tactics. Collectively, they have caused BCBSOK plans alone to make over $36 million in wrongful payments. To this day, they continue to hunt down individuals to enroll in Oklahoma plans and have taken further actions to infiltrate Oklahoma.

7. Through this suit, BCBSOK seeks to recover the damages it has sustained to date and stop Defendants from causing further damages going forward.

## PLAINTIFF

8. Plaintiff is an unincorporated division of Health Care Service Corporation, an Illinois mutual legal reserve corporation with its principal place of business in Illinois. As it pertains to Oklahoma and Oklahoma-based insurance plans, Health Care Service Corporation does business as Blue Cross and Blue Shield of Oklahoma.[1] As noted above, Plaintiff is referred to herein as BCBSOK.

## THE DEFENDANTS AND THEIR ROLES IN THE SCHEME

### I. THE TREATING ENTITIES

9. Defendant SCBH is a California corporation headquartered at 3151 Airway Avenue, T-2, Costa Mesa, CA 92626. SCBH submitted healthcare claims stating that it provided SUD treatment to members of BCBSOK health benefit plans.

---

[1] That is, Health Care Service Corporation and BCBSOK are not separate entities.

FIRST AMENDED COMPLAINT

As explained herein, the statements SCBH made on those claims were false and fraudulent. SCBH received millions of dollars in wrongful payments from BCBSOK and used some of those funds to pay illegal kickbacks to the other Defendants and BCBSOK's own members. SCBH hired Body Broker Defendants (defined below) to find patients and enroll them, and later house them, exchanging kickbacks all along the way.

10.    Defendant Excellence Recovery is an Arizona limited liability company with a registered address of 18261 Tecoma Road, Goodyear, AZ 85338-3671. Excellence Recovery submitted healthcare claims stating that it provided SUD treatment to members of BCBSOK plans. As explained herein, the statements Excellence Recovery made on those claims were false and fraudulent. Excellence Recovery also conspired with SCBH and the other defendants to take control and manipulate their patient's insurance plans, while also offering an avenue to prolong and maximize the payments for each patient by providing distinct billing avenues that could avoid the data safeguards employed by insurers like BCBSOK to catch fraud, waste, and abuse.

## II.    **BODY BROKER DEFENDANTS**

11.    Defendant Rad Life is a California limited liability company with a principal place of business at 2014 Republic Avenue, Costa Mesa, CA 92627.  Rad Life is owned and operated by Defendant Pershall. Rad Life engaged in body brokering patients to SCBH and then provided free housing to BCBSOK members receiving treatment in exchange for kickbacks out of insurance payments. Rad Life's homes are located throughout California, including in Fountain Valley, Huntington Beach, Costa Mesa, Santa Ana, Anaheim, Laguna Beach, and Newport Beach.

12.    Defendant EIE is an Arizona limited liability company with a registered address of 18261 W. Tacoma Road, Goodyear, AZ 85338. EIE is partly owned and was operated by Defendant Passmore. EIE engaged in body brokering patients to SCBH and then provided free housing to BCBSOK members receiving treatment in

exchange for kickbacks out of insurance payments. EIE, through Passmore, also coordinated with others to assist with fraudulent enrollments.

13.    Upon information and belief, Defendant Passmore is a resident of Arizona with an address of 18614 W. Sapium Way, Goodyear, AZ, 85338. Ms. Passmore is a member and part owner of Defendants Excellence Recovery and EIE. She engaged in body brokering patients to SCBH and then provided free housing to BCBSOK members receiving treatment in exchange for kickbacks out of insurance payments. Upon information and belief, Passmore also brokered patients to her own center, Excellence Recovery, in concert with SCBH and others.

14.    Defendant Pershall is a Texas or California resident whose last known address is 11872 Gladstone Drive, Santa Ana, California 92705. Pershall is the owner and operator of Rad Life. He engaged in body brokering patients to SCBH and then provided free housing to BCBSOK members receiving treatment in exchange for kickbacks out of insurance payments.

15.    Together, Rad Life, EIE, Passmore, and Pershall are referred to herein as "Body Brokering Defendants."

### III.   INSURANCE AGENT DEFENDANT

16.    Upon information and belief, Defendant Eisworth, is a resident of Oklahoma with an address of 2300 NE 9th Street, Oklahoma City, OK 73160. He conspired with SCBH and its agents (i.e., Body Brokering Defendants) to fraudulently enroll individuals in BCBSOK plans.

### IV.   DOE DEFENDANTS

17.    The true names of Defendants John Does 1 through 50, and ABC CORPS. 1 through 50, inclusive, are unknown and BCBSOK sues them by such fictitious names under California Code of Civil Procedure § 474. BCBSOK alleges that each Defendant designated as a Doe Defendant is legally responsible to it for the damages alleged herein. When BCBSOK ascertains the true names,

involvement, and capacities of Does 1 through 50 and ABC CORPS. 1 through 50 inclusive, it will seek leave to amend the Complaint.

18.    At all relevant times, each Defendant, whether fictitiously named or otherwise, was the agent, servant, or employee of the others, and was acting within the scope of such agency, enterprise, relationship, services, or employment.

**ALTER EGO/CONSPIRACY/AIDING AND ABETTING ALLEGATIONS**

19.    All Defendants are liable for the obligations of each other as alter egos because they each treated the other entities as their own. Upon information and belief, as alleged herein, Defendants commingled funds and passed prospective and current patients back and forth throughout the scheme.

20.    Individual Defendants are also alter egos of the corporate entities, as they created these entities, in whole or in part, for an improper purpose, including the perpetration of the fraudulent scheme alleged herein. It would therefore be unjust to recognize the individual Defendants as separate from the entity Defendants. Given this relationship, all allegations can be applied equally between the individual defendants and the entity Defendants.

21.    All Defendants are also liable as alter egos of each other as they worked together to monetize the fraudulent conduct through consultation and the submission of fraudulent claims, then split the payments that were ultimately made.

22.    Defendants formed a group of more than two people that amounted to a civil conspiracy. They agreed and conspired to commit the acts set forth herein. They worked together by, for example, performing individual tasks in concert to cause the submission of fraudulent misrepresentations and omissions, and further to evade detection. As such, each Defendant that did not physically commit the tort themselves shared with the immediate tortfeasor a common place or design in its preparation. They are thus jointly and severally liable for all damages arising from the conspiracy.

FIRST AMENDED COMPLAINT

23.   Each Defendant knew of the misconduct alleged herein, actively participated in the scheme(s), and provided substantial assistance or encouragement to the other tortfeasors. When they undertook to provide substantial assistance or encouragement to other tortfeasors, they knew the conduct was tortious. As such, each Defendant is liable for all torts committed as part of the scheme.

## JURISDICTION AND VENUE

24.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over BCBSOK's state law claims pursuant to 28 U.S.C. § 1367. This Court also had diversity jurisdiction under 28 U.S.C. § 1332.

25.   Venue is proper in the Central District of California, Southern Division, under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to BCBSOK's claims occurred in this judicial district, and the Southern Division in particular.

## RELEVANT INDUSTRY BACKGROUND

### I.   BCBSOK RELIES UPON PROVIDERS TO SUBMIT ACCURATE INFORMATION AND CERTIFY COMPLIANCE WITH APPLICABLE LAWS

26.   BCBSOK administers or insures health benefits plans for the government, employers, and private individuals. Particularly relevant here, and as detailed further below, BCBSOK was the primary insurer in Oklahoma offering individual health plans pursuant to the Patient Protection and Affordable Care Act ("ACA")

27.   Individuals enrolled in these plans are referred to as BCBSOK "members." Individuals and entities that provide services are known as "providers."

28.   To obtain payment for services rendered to BCBSOK members, healthcare providers submit standard healthcare "claim forms" (*i.e.*, CMS 1500, HCFA, or UB-04 forms) representing the services provided to respective BCBSOK members.

29.    In submitting these claim forms, providers follow the American Medical Association's Current Procedural Terminology ("CPT") and the CMS Healthcare Common Procedure Coding System ("HCPCS"). *See* 45 C.F.R. §§ 162.1002(a)(5), (b)(1) & (c)(1). Providers also must accurately set forth other information regarding the treatment, such as the place where the service occurred and the diagnosis.

30.    These details – referred to as claims details or data – are integral to the determination of whether a particular claim will be covered under a given member's plan.

31.    BCBSOK relies upon providers to submit truthful and accurate information and representations in their claim forms so that it can accurately determine coverage and payment.

32.    To that end, providers must certify that they follow all applicable laws and regulations, have not violated applicable laws, and that their claim forms are accurate.

33.    In turn, providers intend for BCBSOK to rely on statements in a given claim form to determine payment. For those reasons, the law, industry standards, claim forms, and BCBSOK require providers to certify the accuracy of the information contained in claim forms.

## II.    THE BCBSOK ACA HEALTH BENEFIT PLANS

### A.    Overview of the Insurance Exchange Marketplace

34.    The Patient Protection and Affordable Care Act (ACA) created insurance marketplace exchanges through which individuals (among others) can enroll in privately insured health benefit plans. Prior to the ACA, most individuals obtained insurance through their employers or the government. The ACA sought to provide private insurance avenues for individuals who had previously not been able to obtain insurance through traditional means.

35.    From 2021 through 2024 (the relevant time here), BCBSOK offered various statewide health benefit plans in Oklahoma on the Federal health insurance

FIRST AMENDED COMPLAINT

exchange, located at healthcare.gov. These plans are categorized by "metal levels" (platinum, gold, silver, bronze) and differed primarily in the premium the member had to pay and the member's cost-share. For example, Platinum plans required higher premiums but paid a higher percentage of services – meaning the patient's had lower cost share – than the Gold plan, and so on down the line through the Silver and Bronze options.

36.    "Cost-share" refers to the amount a patient must pay out-of-pocket for a treatment. Combined with premium payments, cost-share helps to sensitize patients to the cost of the services they receive. By having some "skin in the game," patients are motivated to seek out the most cost-effective treatment and make the most of the treatment they do receive. Naturally, it is the duty of the provider to collect the patient's cost-share.

37.    To apply for ACA plans, individuals must submit an application setting forth certain personal information during specified times. In doing so, applicants must certify, under penalty of perjury, the truth of the statements in their application. While the exchange can verify some basic statements in applications (e.g., social security number), it is unable to do so for all statements. Many applicants – and especially the members involved in this case – turn to licensed insurance agents to carry out the application process.

38.    There are three components of the application process that are particularly applicable here, none of which can be verified by the exchange, and are dependent on applicants and their agents to submit truthful information.

**B.    Open Enrollment and Qualifying Events**

39.    Like all ACA exchange plans, BCBSOK Plans can be obtained only during "Open Enrollment," which occurred as follows during the relevant time:

(a)    2021: November 1, 2020 – December 15, 2020

(b)    2022: November 1, 2021 – January 15, 2022

(c)    2023: November 1, 2022 – January 15, 2023

-9-

(d)    2024: November 1, 2023 – January 16, 2024

40.    Enrollment outside of the "open enrollment" period – called "Special Open Enrollment" – requires a qualifying event, such as a loss of coverage under a pre-existing plan. To get "Special Open Enrollment" an applicant must certify under penalty of perjury that they experienced a qualifying event.

### C.    Residency

41.    Applicants must be residents of Oklahoma, which requires submitting an Oklahoma address in the application. Once enrolled, they must remain as residents of the service area in order to be covered under the terms of the plan. If they move outside of the service area, their coverage will terminate.

### D.    Annual Income

42.    As relevant here, annual income determined the amount of government subsidies (premium assistance and/or cost-share reductions) a member could obtain. As to the premium assistance, if an applicant's annual income was a certain percentage of the Federal poverty line, they would be eligible for tax subsidies and cost-share reductions that would greatly reduce the amount they needed to pay for their plan and treatment.

43.    However, one's annual income could not be too low (i.e., below the federal poverty line), or they would be eligible for Oklahoma's Medicaid plan (SoonerCare) and thus ineligible for any subsidies. For providers – especially in California – this was not acceptable, as SoonerCare reimburses at cost and does not provide out-of-state coverage except in limited circumstances. Conversely, the Oklahoma exchange plans provide robust out-of-state coverage.

44.    Thus, Defendants needed to ensure that applicants' annual incomes were not too low so as to render them ineligible for subsidies, but low enough that they would be eligible for premium reductions that could either cover the full amount of the plan's monthly premium or at least lower the monthly premium substantially.

FIRST AMENDED COMPLAINT

### III.  OKLAHOMA'S ADDICTION CRISIS

45.    In addition to offering individual plans, the ACA also increased plan coverage for SUD treatment, among other behavioral health services. This goal was both laudable and necessary, as levels of drug addiction were rapidly increasing across the United States. Since the ACA's enactment in 2008, those levels have reached new heights, even more so in the years since the COVID-19 pandemic.

46.    That holds particularly true in Oklahoma, which according to many sources has the fifth highest rate of SUD in the country, at 16.1% of its population.

47.    The combination of a state plan offering robust out-of-state benefits and a large population in need of treatment provided a perfect target for profiteers like Defendants.

### IV.  OVERVIEW OF SUD TREATMENT

48.    There are various levels of care to SUD treatment that vary in their intensity. The two most intense levels are relevant here.

49.    The most intense level of care is inpatient treatment (a/k/a "detox"). Inpatient means that the patient is housed in a qualified facility (e.g., hospital, treatment facility) and under 24-hour care. The goal at this level is withdrawal management and stabilization. This treatment is shorter, often lasting a few weeks.

50.    After discharge, the next level of care is "intensive outpatient treatment," which is divided into two subsections: partial hospitalization (PHP) and intensive outpatient treatment (IOP). The goals of PHP and IOP vary depending on patient need, but they ultimately seek to allow a patient to advance to general outpatient care as opposed to intensive care.

51.    Importantly, PHP and IOP are performed ***outpatient***, meaning they do not involve housing patients and care is delivered in temporary settings (e.g., appointments).

52.    Nevertheless, many patients choose to live away from their home environments, at least immediately following detox, to remain free of the stressors that may have contributed to their addiction.

53.    Hence, the creation of "sober living homes," which, in theory, are supposed to provide a controlled living environment for individuals going through more intense outpatient treatment until they are ready to return to their normal setting.

54.    While health insurance pays for outpatient treatment, it does not cover rent or housing costs, regardless of whether an individual lives in a sober living home, an apartment, or their own home.

55.    Each level of treatment is supposed to be temporary. The more intense treatment (inpatient treatment) tends to be shorter, while less intensive treatment (outpatient treatment) tends to be longer. Once a patient reaches their baseline – or stops showing improvement – health benefit plans will usually stop paying that level of care.

## DEFENDANTS' FRAUDULENT SCHEME

56.    The fraud in this action is expansive and involves a combination of overlapping conduct: body brokering, fraudulent enrollment, cost-share waivers, and illegal kickbacks spanning multiple interconnected facilities and individuals.

## I.    OVERVIEW OF THE ENTERPRISE

57.    After discharge from the inpatient (i.e., detox) level of care, most patients then receive intensive outpatient treatment (IOP, PHP). Many SUD providers focus on single levels of care. SCBH, however, offers both inpatient and intensive outpatient. By itself, this is not improper. What is improper (and illegal) is SCBH's use of (i) "body brokers" to improperly entice patients into its detox program, and (ii) "sober living operators" to maintain control of patients and ensure they remain at SCBH for the intensive outpatient levels of care.

58.    With respect to SCBH, the body brokers and sober living operators are one and the same. That is, Body Broker Defendants both found patients to enroll and later housed them, receiving kickbacks for these activities. Body Broker Defendants, in turn, used Eisworth to assist with their brokering activities by enrolling patients. The below diagram shows the flow of patients through the scheme:



## II.    BREAKDOWN OF FRAUDULENT ACTS

### A.    SCBH Used Body Broker Defendants to Entice Patients into Treatment

59.    To start the scheme, SCBH contracted with Body Brokering Defendants, who then tracked down individuals that might need treatment and attempted to coerce them into enrolling at SCBH through promises of, *inter alia*, free treatment.

60.    The scheme was spearheaded by J.E. and A.H., who have held roles at SCBH under varying titles: "head of marketing," "director of business development," and/or "director of business relations."[2] BCBSOK is informed and believes that a third-party marketing executive at a related treating provider owned by the same parent company (W.W.) conspired and/or assisted J.E. and A.H. to target Oklahoma residents for treatment.

61.    J.E. ultimately had the leading role in setting up the scheme and paying body broker defendants. He was routinely seen meeting with Pershall and Passmore at SCBH's main office. Oftentimes, payments to Pershall and Passmore were made in cash during these meetings to make it more difficult to track the payments.

62.    J.E. was so close with Pershall and Passmore that some patients believed they were staying in "J.E.'s houses" during their outpatient treatments, as opposed to Pershall or Passmore houses.

63.    Body Brokering Defendants primarily found treatment candidates through social media or word of mouth. For example, Passmore initiated contact by scouring numerous Facebook groups where individuals discussed SUD treatment:

---

[2] These full names will be disclosed to all counsel of record via e-mail. But Defendants all know the identities of these individuals.



**B.     Defendants Enrolled Individuals in BCBSOK Plans Using False
Information**

64.    Many of the individuals in need of treatment did not have insurance, to
wit:



65.    To remedy this issue, Body Broker Defendants worked to enroll
potential patients in BCBSOK plans, often using fraudulent information. Indeed, the
enrollment dates for most of the members at-issue were within days of when their
treatment commenced. Equally remarkable, over two-thirds (2/3's) of the members
were enrolled outside of open enrollment, which could only be done through a
"qualifying event."  Upon information and belief, many of the "qualifying events"
used to justify a special enrollment period were false.

66.    That was just one of many things Body Broker Defendants falsified. For
example, below is a text message screenshot from Passmore and a co-conspirator in

FIRST AMENDED COMPLAINT

which they discuss obtaining a P.O. Box to meet the residency requirements for insurance enrollment:



67.    As the above message indicates, Passmore, Pershall, and the other Body Broker Defendants were not qualified (or licensed) to perform the actual enrollment process.

68.    To carry this out, they utilized an Oklahoma insurance agent, Defendant Eisworth. Both Pershall and Passmore – along with SCBH executive J.E. – routinely asked Eisworth, usually through text or encrypted communications applications, to enroll individuals they had tracked down into BCBSOK benefit plans so that they all could make money off that individual.

69.    Indeed, a staggering two-thirds of the hundreds of BCBSOK members that received treatment at SCBH were enrolled by Eisworth.

70.    Once contacted by Passmore or Pershall, Eisworth instructed individuals to lie about their annual income, employment status, and residency, so they would be eligible for BCBSOK plans and government subsidies.

71.    For example, 23 BCBSOK members utilized a mailing address of 21248 W Almeria Road, Buckeye, Arizona, 85396, which is the address for a home operated by Defendant Excellence Recovery. Many others had the address for SCBH's location at 2220 University Drive, Newport Beach, CA. Still others had the address of 7861 Daisy Circle in Huntington Beach, which Pershall controls. This was done to control the insurance plans and these addresses were not changed after discharge. Passmore is known to spend hours shredding mail that continued to come for former patients.

72.    By way of another example, member "A" (XXXX9745501)[3] advised Eisworth that she worked at a local business making far less than the federal poverty line.

73.    But the truth was not profitable for Defendants because member A's actual income would have made her eligible for SoonerCare, which would not cover SUD treatment outside Oklahoma, much less across the country in California.

74.    So, Eisworth told member A to create a fake monthly income statement showing she was (i) self-employed, and (ii) that her monthly income added up over $18,000 per year.

75.    Following his instructions, member A created a "monthly income statement" far from the type of verifiable document most insurance agents would accept. But Eisworth was happy to do so:

---

[3] The ending digits of the members' SUB-ID are provided, which is sufficient to allow for identification by Defendants. The unredacted names will also be provided to the treating provider, and all defendants after entry of a QPO.

FIRST AMENDED COMPLAINT



76.    The annual income Eisworth instructed member A to fabricate was
carefully chosen because it was high enough to avoid SoonerCare, but low enough
to make member A eligible for cost-share reductions and a tax subsidy that lessened
her monthly premium from over $500.00 to under $100.00. Because Defendants
needed to ensure premiums were paid – and sometimes had to pay premiums
themselves, in violation of applicable laws and BCBSOK policies – they benefitted
by structuring enrollments to achieve the highest premium assistance possible.

77.    Ultimately, Eisworth enrolled this individual in a BCBSOK Silver Plan
with an effective date of January 1, 2022. She started treatment at SCBH the same
day her plan became effective (or at least SCBH started billing on that date).

78.    A similar thing happened with member "B" (XXXX4027101), who
performed sporadic work as a tattoo artist. After advising Eisworth that he had
performed no more than 1 or 2 tattoos the prior month, Eisworth insisted that he
nevertheless provide an income statement showing an amount sufficient to get him
into an BCBSOK plan. Ultimately, BCBSOK paid Defendants thousands of dollars
in claims for the two aforementioned individuals.

79.    Using these tactics, Defendants were able to get individuals into
desirable BCBSOK plans so SCBH could bill for their treatment. The specific
BCBSOK members that Eisworth enrolled are attached hereto in Exhibit A.

FIRST AMENDED COMPLAINT

**C.    SCBH and Excellence Provided Free Inpatient Care and Waived Patient Cost-Share Obligations**

80.    Upon admission to detox, SCBH gave Body Broker Defendants a kickback in the form of a "bed voucher," which gave the broker priority to house the patients they brokered after detox (and get paid by SCBH for doing so from insurance payments).

81.    Unbeknownst to BCBSOK, SCBH and Excellence did not collect copays or any cost-share for the treatment from the patients as they were required to do. As promised by Body Broker Defendants, BCBSOK members received free care. This removed a major incentive incorporated into the design of these insurance plans that helps keep them affordable and motivates members to find the best and most cost-effective care.

**D.    After Inpatient Treatment, Defendants Provided Housing Kickbacks to Ensure SCBH Could Continue to Bill for Outpatient Treatment**

82.    Once a member completed detox, they would be sent to the sober living facility of the body broker that had the "bed voucher" associated with that patient.

83.    Indeed, Pershall and Rad Life's website was open that Rad Life "partnered with trusted outpatient programs to provide continued care." Of course, a license is needed to "provide continued care," which Rad Life did not, and does not, have.

84.    The patients lived for free on the condition they allowed SCBH to bill their insurance. SCBH, in turn, split the insurance payments with Body Broker Defendants. Using the example of member A referenced above, she was brokered by Passmore. As such, after detox, she stayed in the EIE sober living home operated by Passmore. She did not pay anything out of pocket for treatment or for living.

85.    There are multiple distinct kickbacks in this set-up:

a.    Members received two kickbacks: free treatment and free

housing.

      b.     Body Broker Defendants received additional kickbacks for finding and housing the patients. Put another way, the "bed voucher" that gave them the priority to house the patients was monetized.

      c.     In return, SCBH retained control of the members through the outpatient level of care so that they could continue to bill BCBSOK plans.

86.    In addition to the above, BCBSOK is informed and believes that Defendants paid the patient's premiums to ensure the plans remained active so they could continue receiving treatment. For example, Passmore instructed her staff to pay for plan premiums on members' behalf, and then she reimbursed her staff through third-party applications (i.e. Venmo, CashApp, Zelle, etc.).

87.    The false and fraudulent claims submitted by SCBH are attached hereto as Exhibit B.[4] Consistent with the Federal Rules of Evidence, this claims data is drawn from the claims database of BCBSOK and contains certain information set forth in the claim and explanation of benefit forms. Examples of these types of forms are attached in Exhibits D and E.

88.    The claim forms themselves were signed and certified by SCBH's medical directors (L.T. or J.D.S). The other individuals herein also knowingly caused the misrepresentations therein.

### E.   Defendants[5] Conspired with Excellence Recovery to Further Their Scheme and Maximize the Time Spent in Rehab

89.    In many instances, Defendants Passmore first trafficked patients out for initial treatment at Excellence Recovery, before sending them for similar treatment at South Coast. Passmore then conspired with SCBH and EIE to ensure that these individuals would move to EIE houses and continue treatment at SCBH.

---

[4] As noted above, Plaintiff will provide additional claims information upon the entry of a QPO.

[5] At this time, the allegations and references to "Defendants" in Section E do not pertain to Defendants Pershall or Rad Life.

FIRST AMENDED COMPLAINT

90.    By spreading out enrollment and treatment at a seemingly distinct provider from SCBH, Defendants SCBH, EIE, Excellence, and Passmore were able to milk further payments out of BCBSOK by making an end run around the fraud and overutilization safeguards that insurers like BCBSOK utilize to detect fraud, waste, and abuse.

91.    In this regard, Defendants utilized Excellence Recovery to further capitalize on their misconduct and control the plans of fraudulently enrolled members. For example, the addresses for dozens of members correspond to the addresses of Excellence Recovery locations, none of which are in Oklahoma. Similarly, multiple patients had addresses for South Coast's location at 2220 University Drive in Newport Beach, CA.

92.    SCBH and Excellence were so intertwined that many patients believed that they were owned by the same person or part of the same overarching entity. In fact, the standard departure protocol for individuals leaving Excellence was to be transferred to SCBH and EIE for housing.

93.    Even worse, many of the alleged services provided at Excellence were not actually provided. For example, Passmore instructed staff to note that group sessions had been conducted on weekends when that had not actually occurred. In other instances, unlicensed former patients were hired to work as technicians providing treatment despite having no license. Perhaps worst of all, Passmore herself often took it upon herself to give patients "comfort meds" – without any professional administration or prescription – from a stockpile of old medication she kept from prior patients.

94.    The false and fraudulent claims submitted by Excellence Recovery are attached hereto as Exhibit C. As with the SCBH claims, the claims data in these spreadsheets are drawn from BCBSOK's claims database and summarize the data set forth in individual claim and explanation of benefit forms. The claim forms

themselves were signed and certified by Excellence's then-medical director (M.C.) or another attending provider (L.R.).

## FIRST CAUSE OF ACTION

### Fraud and Fraudulent Concealment

### (Against All Defendants)

95.    BCBSOK realleges and incorporates each of this Complaint's previous paragraphs as if fully set forth herein.

96.    Defendants knowingly made, or knowingly caused to be made, material misrepresentations to BCBSOK in enrollment applications and claim forms.

97.    Every claim form Defendants caused to be submitted represented to BCBSOK that Defendants complied with applicable laws, regulations, and procedures, that the services billed were medically necessary and reimbursable, and that the information on the claim forms was true, accurate, and that material facts were not concealed.

98.    As set forth above, each of these representations was knowingly false because Defendants:

(a)    paid kickbacks to obtain patients;

(b)    knew that the patients were not validly covered under their BCBSOK plans;

(c)    waived the cost-share members were responsible for under their Plans;

(d)    paid kickbacks to patients in the form of free housing, premium payments, and free treatment;

(e)    paid kickbacks to "sober living operators" to house patients so they would remain under SCBH control during outpatient treatment.

99.    The spreadsheet attached hereto as Exhibit B contain the specifics of each misrepresentation submitted by Defendants through SCBH. The spreadsheet attached hereto as Exhibit C contains the specifics of each misrepresentation

submitted by Defendants through Excellence Recovery. Exhibits D and E contain 2 examples each of claims and BCBSOK's corresponding payments for members A and B mentioned above. Similar documents correspond to all the other documents in the spreadsheet across the scheme.

100. Defendants also made, or caused to be made, misrepresentations in enrollment forms. Each enrollment form that was submitted represented that all facts contained therein were true and accurate.

101. As stated herein, Defendants knew these representations were knowingly false because Defendants misrepresented or fraudulently concealed information regarding (i) the existence of qualifying events, (ii) residency and address information, and/or (iii) annual income. The claims in Exhibits B and C corresponding to the member IDs in Exhibit A are those resulting from enrollment fraud. To the extent additional information or data is needed for Defendants to match these claims, BCBSOK can provide it upon request.

102. When making these false representations and material omissions, Defendants knew they were false. They made them to induce BCBSOK's reliance so that BCBSOK would issue payments based on materially inaccurate information.

103. BCBSOK reasonably relied on Defendants' false representations and material omissions because Defendants were legally obligated to submit accurate information and even certified they did so.

104. As a direct and proximate result of Defendants' misrepresentations and concealments, BCBSOK has been damaged by, among other things, paying claims that were not properly payable under BCBSOK's health benefit plans, applicable laws, and regulations, in an amount to be proven at trial.

105. Defendants' conduct constitutes malicious, oppressive, fraudulent, willful, and wanton tortious behavior, in blatant and reckless disregard of BCBSOK's rights, for which BCBSOK should recover punitive and exemplary

damages in an amount sufficient to punish Defendants and deter other persons similarly situated from engaging in similar conduct in the future.

## SECOND CAUSE OF ACTION

### RICO, 18 U.S.C. § 1962(c)

### (Against All Defendants)

106.  BCBSOK realleges and incorporates paragraphs 1 through 85 as if fully set forth herein.

107.  Defendants' actions violated The Racketeer Influenced and Corrupt Organizations ("RICO") Act.

108.  As of 2021, Defendants associated together for the common purpose of, *inter alia*, engaging in a fraudulent scheme to deceive BCBSOK into paying claims for patients who were fraudulently enrolled in BCBSOK Plans and treatment at SCBH and Excellence Recovery.  Defendants' actions in furtherance of this scheme constituted a pattern of conduct to further racketeering activity. The conduct started at least as far back as 2020 and continues to this day. The FAC deals with Defendants' acts from 2021 through the day of filing, but that pattern is part of a regular way of doing business – with both BCBSOK plans and those of other insurers – and will continue absent judicial (or other) intervention.

109.  Each of Defendants is a "***person***" within the meaning of RICO, 18 U.S.C. § 1961(3).

110.  Together, the Defendants compromised an ***enterprise*** under 18 U.S.C. § 1961(4). This enterprise operated together to achieve a common purpose, one of which was the carrying out of racketeering activity, which could not be achieved by each alone. The enterprise has an ascertainable structure and purpose beyond just the commission of racketeering activity and is also distinct from each of the individual Defendants. By way of example, SCBH and Excellence Recovery provided day-to-day operations and arranged for treatment by external or internal professionals, Body Brokering Defendants arranged their residents' schedules and

managed the homes, and Eisworth provided insurance agent services outside of the wrongful misconduct alleged herein,

111.  In the alternative, there are two separate enterprises:

(a)  The first enterprise is comprised of SCBH, Excellence Recovery, and Body Broker Defendants. As noted above, these defendants operated as a common unit and achieved a purpose they could not accomplish on their own as set forth above by, for example, luring patients into treatment, being able to pass patients around to maximize payments, and keeping patients within their treatment through the use of free housing.

(b)  The second enterprise is comprised of Body Broker Defendants and Eisworth. They operated together as a common unit and achieved a purpose they could not accomplish on their own by, for example, finding the patients who needed enrollment, providing the fake addresses that could be used for enrollment, and then using that information to push through enrollment applications.

112.  The enterprise(s) were engaged in or affected ***interstate commerce***. Indeed, the movement of patients from Oklahoma to California, the submission of claims in California intended to reach and be paid by BCBSOK, and the payment of funds from outside California to providers in California, were among the central tenants of the scheme.

113.  As detailed herein, Defendants' fraudulent scheme involved a ***pattern of racketeering activity***, including multiple acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343), and violations of the Travel Act, 18 U.S.C. § 1952. The acts underlying these predicates are set forth in paragraphs 1-85

114.  These acts demonstrate a sustained pattern of racketeering activity as well as a threat of continued racketeering activity. Fraudulent claims were submitted on a near-weekly basis starting before 2021 and continuing through the present. Defendants' actions were part of a sustained pattern of doing business that was continuously ongoing from at least 2021 through the present.

FIRST AMENDED COMPLAINT

115. Additionally, BCBSOK was not the only victim of this racketeering activity. Defendants engaged in similar patterns and practice of racketeering activity with other insurers and health plans that provided similar health benefits.

116. Each claim form submission was done intentionally as part of Defendants' scheme to defraud BCBSOK (and its members) through use of interstate mail and/or interstate wires.

117. Accordingly, each claim stemming from fraudulent enrollment in a BCBSOK Plan constitutes a predicate act of mail or wire fraud in support of BCBSOK's RICO claim and in violation of the RICO Act.

118. In addition, as alleged herein, Defendants traveled in – or caused their agents to travel in – interstate commerce and made use of interstate commerce facilities to conduct unlawful activity and in violation of their duty of fidelity to, *inter alia*, their patients. In that regard, as noted above, Defendants intended to, and actually did, engage, or attempt to engage, in unlawful enrollment fraud and bribery in violation of state and federal law, including 74 OK Stat § 3404, Cal. Penal Code § 549, Cal. Ins. Code §§750, 1871.4, 1871.7, and Cal. Health & Safety Code §§ 445, 11831.6.

119. Further, it was foreseeable that BCBSOK would, and in fact did, reasonably rely on Defendants' fraudulent and false enrollment and claim forms because they contained the hallmarks of legitimate submissions. For example, the claims contained the gloss of licensed professionals, were purportedly verified and certified, and contained recognized procedure and/or revenue codes. Each claim specifically certified that the procedures billed were actually conducted, medically necessary, and lawful. The enrollment forms, meanwhile, contained accurate social security information and were certified as accurate under penalty of perjury.

120. By violating the RICO Act, Defendants directly and proximately caused BCBSOK harm because BCBSOK paid money to Defendants for members fraudulently enrolled in plans and for false and fraudulent claims.

### THIRD CAUSE OF ACTION

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against All Defendants)

121.  BCBSOK realleges and incorporates paragraphs 1 through 85, and  97-111 above as if fully set forth herein.

122.  Defendants have conspired with each other to violate 18 U.S.C. § 1962(c). The object of the conspiracy is to conduct and/or participate in the conduct and affairs of the Enterprise described above through a pattern of racketeering activity.

123.  As set forth above, Defendants each engaged in multiple overt predicate acts of fraudulent racketeering in furtherance of the conspiracy which, by their nature, give rise to the plausible inference that the object of the conspiracy was to violate RICO. They knew their ongoing acts were part of an overall pattern of racketeering activity. For example, a purpose of the conspiracy was to defraud BCBSOK into paying healthcare claims to which Defendants were not entitled to reimbursement. The Enterprise was the vehicle that allowed the Defendants to carry out this scheme while evading detection.

124.  As a direct and proximate cause of the conspiracy and the acts taken in furtherance thereof, BCBSOK has suffered injuries to its business and property by wrongly paying money as a result of the Enterprise's racketeering activity.

### FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants)

125.  BCBSOK realleges and incorporates paragraphs 1 through 85 above as if fully set forth herein.

126.  Defendants negligently misrepresented to BCBSOK, or caused to be negligently misrepresented to BCBSOK, that all services were provided in

compliance with all laws and industry standards, were medically necessary, were compensable, and all material information had been disclosed.

127.   Defendants also negligently misrepresented to BCBSOK, or caused to be negligently misrepresented to BCBSOK, that all information they caused to be submitted on claim forms was true and accurate.

128.   BCBSOK reasonably relied on Defendants' false representations because Defendants were legally obligated to submit accurate information for valid claims and enrollment applications, and disclose material information.

129.   As a direct and proximate result of BCBSOK's reasonable reliance and Defendants' misrepresentations and concealments, BCBSOK has been damaged by, among other things, paying claims that were not properly payable under health benefit plans, in an amount to be proven at trial.

130.   Defendants' conduct was wantonly negligent, and in blatant and reckless disregard of BCBSOK's rights. BCBSOK seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated from engaging in similar conduct.

## **FIFTH CAUSE OF ACTION**

### **Intentional Interference with Economic/Contractual Relationship**
### **(Against All Defendants)**

131.   BCBSOK realleges and incorporates paragraphs 1 through 85 above as if fully set forth herein.

132.   BCBSOK entered into health benefit plans with its members. Although Defendants fraudulently induced BCBSOK to enter into those contracts, their terms applied while they remained in effect.  The contracts obligated BCBSOK's members to pay monthly premiums, deductibles, copays, or coinsurance for services that providers rendered to them. The contracts also required that BCBSOK be updated about material changes that might affect enrollment status.

133. Defendants knew about BCBSOK's plans with its members and Defendants intentionally acted to interfere with the contracts by providing financial, housing, and other consideration to BCBSOK's members to induce them to treat with Defendants.

134. By inducing and incentivizing BCBSOK's members to seek treatment with them, Defendants interfered with BCBSOK's plans with their members.

135. Defendants' intentional interference with the economic relationship between BCBSOK and its members has directly and proximately caused BCBSOK to suffer monetary harm in an amount to be proven at trial.

136. Defendants' conduct was malicious, oppressive, fraudulent, willful, and wantonly tortious, and in blatant and reckless disregard of BCBSOK's rights. BCBSOK seeks to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter other similarly situated individuals and entities from engaging in similar conduc

## SIXTH CAUSE OF ACTION

### Aiding & Abetting Tortious Conduct

### (Against All Defendants)

137. BCBSOK realleges and incorporates paragraphs 1 through 85 as if fully set forth herein.

138. Defendants had, at all relevant times, actual knowledge of each individual defendant's tortious conduct as discussed herein.

139. Defendants understood that each individual defendant intended to defraud BCBSOK as forth in this Complaint.

140. Defendants nonetheless gave substantial assistance and encouragement to each individual defendant as discussed herein.

141. Defendants' conduct was a substantial factor in bringing about BCBSOK's payment of the fraudulent claims.

142. Defendants thus aided and abetted tortious conduct that damaged BCBSOK.

## SEVENTH CAUSE OF ACTION

### Violations of Business and Professional Code Section 17200, et seq.

### (Against All Defendants)

143. BCBSOK realleges and incorporates paragraphs 1 through 85 as if fully set forth herein.

144. Defendants violated California's Unfair Competition Law ("UCL") as set forth in Business and Professions Code §§ 17200 et seq. Under the UCL, unfair competition means any "unlawful, unfair or fraudulent business act or practice."

145. As this Complaint sets forth, Defendants' business acts and practices are unlawful because they violate the following statutes: (i) The Anti-Kickback Statute, 18 U.S.C. § 1320; (ii) The Eliminating Kickbacks in Recovery Act, 18 U.S.C. § 220; (iii) the Health Care Fraud Statute, 18 U.S.C. § 1347; (iv) RICO, 18 U.S.C. § 1962(c); (v) California's Insurance Anti-Kickback Law, Cal. Ins. Code §§ 750 et seq., (vi) California's Anti-Referral Law, Health & Safety Code § 445, and (vii) California's Uniform Controlled Substances Act, Health & Safety Code § 11570.

146. Defendants also used unfair fraudulent business practices to interfere with the central purpose of BCBSOK's business, thereby damaging BCBSOK to profit for themselves. Specifically, Defendants engaged in fraudulent scheme(s) and conduct in the form of enrollment fraud, body brokering, and unlawful kickbacks as set forth herein.

147. As referenced above, Defendants took specific steps to hide their activities and evade detection.

148. Defendants' unlawful, unfair, and fraudulent business acts and practices have directly and proximately caused BCBSOK to suffer monetary harm. BCBSOK seeks restitution for the harm in an amount to be proven at trial.

-30-

## EIGHTH CAUSE OF ACTION

### Money Had and Received

### (Against all Defendants)

149.  BCBSOK realleges and incorporates the paragraphs above as if fully set forth herein.

150.  In addition, or in the alternative, Defendants are liable for money had and received.

151.  As set forth herein, BCBSOK paid claims to Defendants.

152.  BCBSOK would not have paid the claims but for the wrongful conduct of Defendants as alleged herein.

153.  Defendants extracted the payments by withholding the truth of the conduct that was occurring.

154.  The amounts paid by BCBSOK should be returned to BCBSOK in good conscience.

## NINTH CAUSE OF ACTION

### Unjust Enrichment/Quantum Meruit/Restitution

### (Against All Defendants)

155.  BCBSOK realleges and incorporates paragraphs 1 through 85 as if fully set forth herein.

156.  BCBSOK conferred benefits on Defendants by paying Defendants for healthcare claims that were not reimbursable.

157.  Defendants have unjustly accepted and retained the benefit that BCBSOK conferred on them.

158.  Because it would be unjust and inequitable for Defendants to continue to retain the benefits that BCBSOK conferred on them, BCBSOK seeks the return of the money paid.

## **PRAYER FOR RELIEF**

WHEREFORE, BCBSOK, respectfully requests a judgment for BCBSOK and against Defendants, as follows:

A.    For actual, compensatory, and consequential damages in an amount to be proven at trial;

B.    An order obligating Defendants to disgorge all revenues and profits from their scheme;

C.    For treble, exemplary, and/or punitive damages;

D.    For pre- and post-judgment interest;

C.    For civil penalties to the extent the law permits;

D.    For other statutory remedies available to BCBSOK to the extent the law permits;

E.    For injunctive relief barring Defendants from continuing their scheme and submitting claims to BCBSOK;

F.    For declaratory relief that any claims previously pending, currently pending, and that might be submitted by Defendants, or caused to be submitted by Defendants in the future, are not payable.

G.    For an award of costs of its suit to the extent the law permits;

F.    For an award of attorney's fees to the extent the law permits, including as permitted under 18 U.S.C. § 1964(c).

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial as to all matters so triable.

-32-

Dated: March 31, 2025

FOX ROTHSCHILD LLP

By: _/s/ Benjamin H. McCoy_
Benjamin McCoy (*pro hac vice*)
John J. Shaeffer
10250 Constellation Avenue, Suite 900
Los Angeles, CA 90067
Tel: 310-228-4481
Fax: 310-556-9828

*Attorneys for Plaintiff*